# Exhibit D

# BRETTLER SECURITY AGREEMENT

This Brettler Security Agreement (the "Agreement") dated as of May 3, 2023 is given by Car Toys, Inc., a Washington corporation ("CT" or "Borrower") in favor of Daniel E. Brettler ("Brettler" or "Lender").  Capitalized Terms not otherwise defined herein shall have the same meaning as is provided in that certain Brettler Secured Loan Agreement (the "Secured Loan Agreement") of even date by and between Borrower and Lender  or by the UCC (as defined below), as the case may be (such meanings to be equally applicable to both the singular and plural forms of the terms defined).  Borrower and Lender are "Parties" and each a "Party" to this Agreement, the Secured Loan Agreement, the Brettler Security Agreement and various other loan documents (collectively, the "Secured Loan Documents").

## I.     Recitals.

A.     CT is a corporation organized under the laws of the state of Washington, with its principal place of business at 4124 55th Avenue East, Seattle, WA 98105.

B.     Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of CT.

C.     CT is the largest independent multi-channel specialty car audio and mobile electronics retailer in the United States.

D.     CT's sister company, Wireless Advocates, LLC, a Washington limited liability company, is the debtor in a pending case under Chapter 7 of the U.S. Bankurptcy Code, 11 U.S.C. §101, et seq.  Wireless Advocates' cessation of its operations and liquidation under Chapter 7 have poised severe financial challenges for CT and necessitated CT obtaining financing for its operations.

E.  Subject to the terms and conditions of this Agreement, the Secured Loan Agreement, the Secured Promissory Note, and other related instruments and documents (collectively, the "Secured Loan Documents"), Lender may, in his sole discretion and without obligation of any kind whatsoever, elect from time to time to advance funds to Borrower  (the "Advances" and each a "Advance"), as may be necessary to fund CT's operations. Lender's Advances shall be secured by security interests in substantially all the existing and future-acquired assets of CT (the "CT Collateral").

## II.     Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.     Definitions.  The following words will have the following meanings when used in this Agreement.  Capitalized terms not defined shall have the meanings provided to them in the

1

Uniform Commercial Code, RCW 62A.9A-102. All references to dollar amounts will mean amounts in lawful money of the United States of America.

1.1 "Collateral" means:

All the following described property of the Borrower, whether now owned or hereafter acquired, whether now existing or hereafter arising, wherever located and any accessions thereto or proceeds therefrom:

(a) All General Intangibles, Payment Intangibles, Inventory, Equipment, Chattel Paper (whether tangible or electronic), Commercial Tort Claims, Deposit Accounts, documents, goods, Instruments, Investment Property, Letter-of-credit Rights, letters of credit and money;

(b) All Fixtures, Records and Goods of every kind and nature including without limitation Inventory and Equipment);

(c) All Accounts (including all Receivables), contract rights or rights to the payment of money and insurance claims and proceeds;

(d) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, including without limitation Commercial Tort Claims;

(e) All books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records"); and

(f) All Intellectual Property Collateral, as defined herein.

1.2 "Copyrights" means, collectively, with respect to Borrower, all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all tangible embodiments of the foregoing and all copyright registrations and applications made by Borrower, in each case, whether now owned or hereafter created or acquired by or assigned to Borrower, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

1.3 "Deposit Account Control Agreement" means an agreement providing Lender control over any Deposit Account of Borrower and in form reasonably satisfactory to

#5155383 v1 / 74115-001

Lender and sufficient under the UCC to perfect Lender's security interest in all such Deposit Accounts of Borrower.

      1.4     "<u>Event of Default</u>" means Borrower's failure to pay or perform any of the Obligations as and when due to be paid or performed under this Agreement or under any of the Secured Loan Documents. .

      1.5     "<u>Intellectual Property Collateral</u>" means, collectively, the Patents, Trademarks (excluding only United States intent-to-use Trademark applications to the extent that and solely during the period in which the grant of a security interest therein would impair, under applicable federal law, the registrability of such applications or the validity or enforceability of registrations issuing from such applications), Copyrights, Software, Trade Secrets, Intellectual Property Licenses and all other industrial, intangible and intellectual property of any type, including mask works and industrial designs.

      1.6     "<u>Intellectual Property Licenses</u>" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property Collateral owned by CT.

      1.7     "<u>Obligations</u>" means any and all debts, liabilities, and obligations of the Borrower to the Lender, now or hereafter existing and however, whether voluntary or involuntary, direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by the Lender for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. The "<u>Obligations</u>" include, without limitation, any and all existing and future Obligations under the Secured Loan Documents as well as any and all other existing or future obligations of the Borrower to the Lender for reasonable attorneys' fees and all other costs and expenses incurred by Lender however arising, including those relating to the creation, collection or enforcement of any debts, liabilities, or obligations of the Borrower to the Lender, U.S. Bank and any other parties.

      1.9     "<u>Patents</u>" means, collectively, with respect to Borrower, all patents issued or assigned to, and all patent applications and registrations made by Borrower, whether issued, established or registered or recorded in the United States or any other country or any political subdivision thereof and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

3

1.10    "<u>Receivables</u>" means all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) Instruments, and (v) to the extent not otherwise covered above, all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Borrower's rights, if any, in any goods or other property giving rise to such right to payment and all collateral or other supporting obligations related thereto and all Records relating thereto.

1.11    "<u>Trade Secrets</u>" means, collectively, with respect to Borrower, all know-how, business secrets, manufacturing and production processes and techniques, inventions, research and development information, technical, marketing, financial and business data and databases, pricing and cost information, business and marketing plans, customer and supplier lists and information, all other confidential and proprietary information and all tangible embodiments of the foregoing, together with any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to such trade secrets, (ii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto including damages and payments for past, present or future misappropriations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present or future misappropriations thereof.

1.12    "<u>Trademarks</u>" means, collectively, with respect to Borrower, all trademarks (including service marks), slogans, logos, symbols, certification marks, collective marks, trade dress, uniform resource locators (URL's), domain names, corporate names and trade names, whether statutory or common law, whether registered or unregistered and whether established or registered in the United States or any other country or any political subdivision thereof,  that are owned by or assigned to Borrower, all registrations and applications for the foregoing and all tangible embodiments of the foregoing, together with, in each case, the goodwill symbolized thereby and any and all (i) rights and privileges arising under applicable law and international treaties and conventions with respect to Borrower's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

1.13    "<u>Security Agreement</u>" means this Agreement, as amended, restated and supplemented by this Agreement, and as may be further amended or modified from time to time, together with all exhibits and schedules attached to this Security Agreement from time to time.

1.14    "<u>Source Code Escrow Agreement</u>" means an agreement for placing and maintaining software source code, documentation, and related materials in escrow with a third-party escrow agent under the terms of a software license agreement, with instructions on how to adapt the agreement for use under a software as a service (SaaS) agreement.

#5155383 v1 / 74115-001

1.15 "Uniform Commercial Code" or "UCC" shall mean the Washington Uniform Commercial Code, Title 62A RCW, Chapter 9A, as amended from time to time, or any successor provisions of law.

2. Grant of Security Interest.

For valuable consideration, the Borrower (1) grants to the Lender a security interest in the Collateral to secure the Obligations, (2) agrees that the Lender will have the rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights which the Lender may have under any existing documents or by applicable law, and (3) agrees to be bound by the provisions of this Agreement. Except for the Permitted Liens (as defined in the Secured Loan Agreement), the security interests granted herein shall be senior in priority to any and all other security interests in the Collateral and any of Borrower's existing or future assets. This Agreement is subject to the terms of the Secured Loan Agreement between Borrower and Lender of even date herewith, as it may be amended from time to time.

3. Representations, Warranties and Covenants of Borrower.

3.1 Recitals. The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

3.2 Organization. The Borrower is a limited liability company organized, validly existing and in good standing under the laws of the State of Washington, and has its principal office at 4124 55th Avenue East, Seattle, WA 98105.

3.3 Authorization. The execution, delivery, and performance of this Agreement by the Borrower has been duly authorized by all necessary action by the Borrower and does not conflict with, result in a violation of, or constitute a default under (a) any provision of its certificate of formation, operation agreement, or any agreement or other instrument governing or binding upon the Borrower or (b) any law, government regulation, court decree, or order applicable to Borrower.

3.4 Perfection of Security Interests. Borrower consents to Lender filing financing statements and otherwise agrees to take whatever other actions are requested by the Lender to perfect and continue the Lender's senior priority security interests in the Collateral. Upon request of the Lender, and to the extent necessary to perfect Lender's interests therein, the Borrower shall deliver to the Lender any and all of the documents evidencing or constituting the Collateral or such other documents or information as Lender may reasonably require for this purpose. The Borrower hereby appoints the Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement. The Borrower will immediately notify the Lender of any change in the Borrower's name, including any change to the assumed business names of the Borrower or any change in its state of organization. The Borrower will also immediately notify the Lender of any

5

change in the location of the Borrower or the Collateral. This Agreement is a continuing security agreement and will continue in effect even though all or any part of the Obligations are paid in full.

      3.5   <u>Transactions Involving Collateral</u>. Without Lender's prior written consent, Borrower will not sell or otherwise transfer or dispose of the Collateral, except that the Borrower may sell inventory, machinery and equipment in the ordinary course of business. The Borrower will not pledge, mortgage, lease, assign, license, rent, subordinate, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of the Lender. This prohibition includes security interests even if junior in right to the security interests granted under this Agreement.

      3.6   <u>Collateral Schedules and Locations</u>. The Borrower will deliver to the Lender, as often as the Lender will reasonably require, such schedules, lists, descriptions, and designations of such Collateral as the Lender may require to identify the location, nature and extent of such Collateral.

      3.7   <u>Status of Collateral</u>. The Collateral may not be utilized in any way by anyone, except the Borrower, without the Lender's prior written consent. The Borrower will immediately notify the Lender of all cases involving the return, rejection, repossession, loss or damage of or to any Collateral of any request for credit or adjustment or of any other dispute rising with respect to the Collateral; and generally of all happenings and events affecting the Collateral or the value or the amount of the Collateral. The Borrower will not seek the reissuance of any certificate or other evidence of the Collateral from any governmental entity without the Lender's written consent. The Borrower will not enter into any Intellectual Property Licenses or sale agreement outside the ordinary course of business relating to the Collateral without Lender's written consent.

Borrower agrees that the Lender may at its option at any time, whether or not the Borrower is in default:

      (a)   Require the Borrower to deliver to the Lender (i) copies of or extracts from the Borrower's books and records, and (ii) information on any contracts, applications or other matters affecting the Collateral;

      (b)   Examine the Collateral, including the books and records, and make copies of or extracts from the books and records, and for such purposes enter at any reasonable time upon the property where any Collateral or any books and records are located;

      (c)   Require the Borrower to deliver to the Lender any Instruments, Chattel Paper or Letters of Credit which are part of the Collateral, and to assign to the Lender the proceeds of any such Letters of Credit (provided that so long as there is not an Event of Default, the foregoing obligations shall only be to the extent necessary to perfect Lender's obligation in such Collateral); and/or

#5155383 v1 / 74115-001

(d)     Notify any account Borrowers, any buyers, assignees or licensees of the Collateral, or any other persons of the Lender's interest in the Collateral.

3.8     <u>Maintenance of Collateral</u>.  Borrower shall maintain and preserve the Collateral and shall pay when due all taxes or other fees and costs required to be paid to a governmental entity to preserve the validity and enforceability of the Borrower's Intellectual Property Collateral and prevent the attachment of any liens or encumbrances against the Collateral, including without limitation the Intellectual Property Collateral.

3.9     <u>Authorization to File Financing Statements and Other Notice Filings</u>.  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of Washington, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of Washington, or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Borrower is an organization, the type of organization and any organizational identification number issued to the Borrower.  The Borrower agrees to furnish any such information to the Lender promptly upon the Lender's request.

3.11     <u>Taxes, Assessments and Liens</u>.  All taxes, assessments and liens upon the Collateral, its use or operation will be paid in accordance with law.  Borrower may withhold any such payment or may elect to contest any lien if the Borrower is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as the Lender's interest in the Collateral is not jeopardized, in Lender's sole opinion.  If the Collateral is subjected to a lien which is not discharged within 30 days, the Borrower will deposit with the Lender cash (other than cash which is itself Collateral of Lender or the proceeds of an advance under the Secured Loan Agreement), a sufficient corporate surety bond or other additional security satisfactory to the Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest, Borrower will defend itself and the Lender and will satisfy any final adverse judgement before enforcement against the Collateral.  The Borrower will name the Lender as an additional obligee under any surety bond furnished.

3.12     <u>Compliance with Governmental Requirements</u>.  Borrower will comply promptly with all laws, ordinances and regulations of all governmental authorities applicable to the production, disposition, or use of the Collateral.  Borrower may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as the Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

3.13     <u>Other Actions</u>.  To further the attachment, perfection and first priority of, and the ability of the Lender to enforce, the Lender's security interest in the Collateral, the

#5155383 v1 / 74115-001

Borrower agrees, in each case at the Borrower's expense, to take the following actions with respect to the following Collateral:

        a.     <u>Promissory Notes and Tangible Chattel Paper</u>. If the Borrower shall at any time hold or acquire any promissory notes or tangible chattel paper, the Borrower shall forthwith endorse, assign and deliver the same to the Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Lender may from time to time specify.

        b.     <u>Deposit Accounts</u>. For each deposit account that the Borrower at any time opens or maintains, the Borrower shall, at the Lender's request and option, pursuant to a Deposit Account Control Agreement in form and substance satisfactory to the Lender, either (a) cause the depositary bank to comply at any time with instructions from the Lender to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without further consent of the Borrower, or (b) arrange for the Lender to become the customer of the depositary bank with respect to the deposit account, with the Borrower being permitted, only with the consent of the Lender, to exercise rights to withdraw funds from such deposit account. The Lender agrees with the Borrower that the Lender shall not give any such instructions or withhold any withdrawal rights from the Borrower, unless an Event of Default has occurred and is continuing, or would occur, if effect were given to any withdrawal not otherwise permitted by the Secured Loan Documents. The provisions of this paragraph shall not apply to (i) any deposit account for which the Borrower, the depositary bank and the Lender have entered into a cash collateral agreement specially negotiated among the Borrower, the depositary bank and the Lender for the specific purpose set forth therein, and (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Borrower's salaried employees.

        c.     <u>Investment Property</u>. If the Borrower shall at any time hold or acquire any certificated securities, the Borrower shall forthwith endorse, assign and deliver the same to the Lender, accompanied by such instruments of transfer or assignment duly executed in blank as the Lender may from time to time specify. If any securities now or hereafter acquired by the Borrower are uncertificated and are issued to the Borrower or its nominee directly by the issuer thereof, the Borrower shall immediately notify the Lender thereof and, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (a) cause the issuer to agree to comply with instructions from the Lender as to such securities, without further consent of the Borrower or such nominee, or (b) arrange for the Lender to become the registered owner of the securities. If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Borrower are held by the Borrower or its nominee through a securities intermediary or commodity intermediary, the Borrower shall immediately notify the Lender thereof and, at the Lender's request and option, pursuant to an agreement in form and substance satisfactory to the Lender, either (i) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply with entitlement orders or other instructions from the Lender to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Lender to such commodity intermediary, in each case

#5155383 v1 / 74115-001

without further consent of the Borrower or such nominee, or (ii) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Lender to become the entitlement holder with respect to such investment property, with the Borrower being permitted, only with the consent of the Lender, to exercise rights to withdraw or otherwise deal with such investment property. The Lender agrees with the Borrower that the Lender shall not give any such entitlement orders or instructions or directions to any such issuer, securities intermediary or commodity intermediary, and shall not withhold its consent to the exercise of any withdrawal or dealing rights by the Borrower, unless an Event of Default has occurred and is continuing, or, after giving effect to any such investment and withdrawal rights not otherwise permitted by the Loan Documents, would occur.

        d.      <u>Collateral in the Possession of a Bailee</u>. If any Collateral is at any time in the possession of a bailee, the Borrower shall promptly notify the Lender thereof and, at the Lender's request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to the Lender, that the bailee holds such Collateral for the benefit of the Lender, and that such bailee agrees to comply, without further consent of the Borrower, with instructions from the Lender as to such Collateral. The Lender agrees with the Borrower that the Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Borrower with respect to the bailee.

        e.      <u>Commercial Tort Claims</u>. If the Borrower shall at any time hold or acquire a Commercial Tort Claim, the Borrower shall immediately notify the Lender in a writing signed by the Borrower of the particulars thereof and grant to the Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Lender. Borrower shall also immediately execute or otherwise authenticate a supplement to this Agreement, and otherwise take all necessary actions to subject such Commercial Tort Claim to the first priority security interest created under this Agreement.

        f.      <u>Insurance</u>. The Borrower will maintain with financially sound and reputable insurers liability insurance with respect to its managers and officers, and casualty insurance as to the Collateral, its properties and business, in such amounts and subject to such terms as are consistent with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Lender. In addition, all such insurance shall be payable to the Lender as loss payee under a standard loss payee clause. Without limiting the foregoing, the Borrower will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage,

9

with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, (ii) maintain all such workers' compensation or similar insurance as may be required by law, and (iii) maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; and product liability insurance.

        i.    <u>Insurance Proceeds</u>.  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $50,000, be disbursed to the Borrower for direct application by the Borrower solely to the repair or replacement of the Collateral so damaged or destroyed, and (ii) in all other circumstances, at Lender's election be held by Lender as cash collateral for the Obligations.  The Lender may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Lender may reasonably prescribe, for direct application by the Borrower solely to the repair or replacement of the Borrower's property so damaged or destroyed, or the Lender may apply all or any part of such proceeds to the Obligations.

        j.    <u>Continuation of Insurance</u>.  All policies of insurance shall provide for at least 30 days prior written cancellation notice to the Lender.  In the event of failure by the Borrower to provide and maintain insurance as herein provided, the Lender may, at its option, provide such insurance and charge the amount thereof to the Borrower.  The Borrower shall furnish the Lender with certificates of insurance and policies evidencing compliance with its foregoing insurance obligations.

        4.    <u>Expenditures by Lender</u>.  If not discharged or paid when due, the Lender may (but will not be obligated to) discharge or pay any amounts required to be discharged or paid by the Borrower under this Agreement, including without limitation all taxes, liens, security interests, encumbrances, and other claims, at any time levied or placed on the Collateral.  Lender also may (but will not be obligated to) pay all costs for maintaining and preserving the Collateral.  All such expenditures incurred or paid by the Lender for such purposes will then bear interest at the rate of 8% per annum from the date incurred or paid by the Lender to the date of repayment by the Borrower.  All such expenses will be payable upon demand by the Borrower or, at Lender's election, may be advanced by him.  This Agreement also will secure Borrower's payment of these amounts.  Such right will be in addition to all other rights and remedies to which the Lender may be entitled upon the occurrence of an Event of Default.

        5.    <u>Rights and Remedies on Event of Default</u>.  If an Event of Default occurs under any of the Secured Loan Documents, the Lender: (a) will have all of the rights of a secured lender under the UCC; and (b) in addition and without limitation to the foregoing, may exercise any one or more of the following rights and remedies, in addition to any granted in any other Secured Loan Documents:

#5155383 v1 / 74115-001

5.1    <u>Assemble Collateral</u>. The Lender may require the Borrower to deliver to the Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender.

5.2    <u>Preservation of Collateral</u>. The Lender may enter upon the property where any Collateral, including any books and records, are located and take possession of such Collateral and such books and records, and use such property (including any buildings and facilities) and any of the Borrower's equipment, if the Lender reasonably deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and use or transfer any of the Borrower's rights and interests in any intellectual property now owned or hereafter acquired by Borrower, if the Lender reasonably deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Borrower agrees that any such use or transfer shall be without any additional consideration to Borrower.

5.3    <u>Sell the Collateral</u>. The Lender will have full power to sell, lease, license, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of the Borrower. The Lender may sell the Collateral at public auction or private sale. The Borrower hereby appoints the Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to sell, lease, transfer or otherwise deal with the Collateral or proceeds thereof. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Lender will give the Borrower reasonable notice of the time after which any private sale or other intended disposition of the Collateral is to be made. The requirements of reasonable notices will be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, will become a part of the Obligations secured by this Agreement and will be payable on demand by the Borrower, with interest at the rate stated in the Secured Loan Agreement from the date of expenditure until repaid.

5.4    <u>Appoint Receiver</u>. In addition to all other remedies herein provided for, Borrower agrees that upon the occurrence of an Event of Default, or any event or circumstance which, with the lapse of time or the giving of notice, or both, would constitute an Event of Default, the Lender as a matter of contract right shall be entitled to the appointment of a general receiver for the Borrower, or an in rem receiver or receivers for all or any part of the Collateral, at Lender's election and in its sole discretion, and whether such receivership be incident to a proposed sale of such property or otherwise, and without regard to the value of the Collateral or the solvency of the Borrower. Borrower consents to the appointment of such receiver or receivers without bond, waives any and all defenses to such appointment and agrees not to oppose any application therefor by the Lender. Borrower acknowledges Lender owes no duty to arbitrate any disputes relating to, or arising under, this Agreement or any of the Secured Loan Documents, including without limitation Lender's right to the appointment of a receiver as provided herein. Nothing in this Agreement shall be construed as depriving the Lender of any of its rights, remedies and

11

#5155383 v1 / 74115-001

privileges it now holds or in the future may hold under applicable law to have a general or in rem receiver appointed pursuant to RCW 7.60.025 as a matter of right; provided, however, that the appointment of such receiver by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of the Lender to receive any and all rents, income or proceeds from the Collateral. Any money advanced by the Lender in connection with any receivership shall be a demand obligation owing by Borrower to the Lender and shall bear interest from the date of such advance until paid at the Default Rate of 13 per cent per annum and shall be a part of the Obligations secured by the Collateral.

5.5    <u>Collect Revenues, Apply Accounts</u>.  The Lender, either itself or through a receiver, may collect the payments, rents, income, proceeds, and revenue from the Collateral.  The Lender may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as the Lender may determine.  For these purposes, the Lender may on behalf of and in the name of the Borrower, endorse note, checks, drafts, money orders, instruments and items pertaining to payment, shipment, or storage of any Collateral.  To facilitate collection, the Lender may notify Borrower's account borrowers and obligors on any Collateral to make payments directly to the Lender.

5.6    <u>Other Rights and Remedies</u>.  The Lender will have all the rights and remedies of a secured creditor under the provisions of the UCC.  In addition, the Lender will have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

5.7    <u>Cumulative Remedies</u>.  All of the Lender's rights and remedies, whether evidenced by this Agreement or the Secured Loan Documents or by any other writing or as provided by law, will be cumulative and may be exercised singularly or concurrently.  Election by the Lender to pursue any remedy will not exclude pursuit of any other remedy, and an election to make expenditure or to take action to perform an obligation of the Borrower under this Agreement, after the Borrower's failure to perform, will not affect the Lender's right to declare a default and to exercise its remedies.

5.8    <u>Marshalling</u>.  The Lender shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, the Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Lender's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Borrower hereby irrevocably waives the benefits of all such laws.

6.    <u>Miscellaneous Provisions</u>.

6.1     Entire Agreement.  This Agreement contains the complete, full, and exclusive understanding of the Parties as to its subject matter.  Any amendments to this Agreement shall be effective and binding on the Parties only if any such amendments are in writing and signed by the authorized representatives of both Parties.

6.2     Notices.  All notices required to be given under this Agreement will be given in writing and will be effective when actually delivered or when deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address in the Secured Loan Agreement.  Any party may changes its address for notices under this Agreement by giving formal written notice to the other party, specifying that the purpose of the notice is to change the party's address.  For notice purposes, the Borrower agrees to keep the Lender informed at all times of the Borrower's current address.

6.3     Severability.  If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding will not render that provision invalid or unenforceable as to any other persons or circumstances.  If feasible, any such offending provision will be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it will be stricken and all other provisions of this Agreement in all other respects will remain valid and enforceable.

6.4     Lender Successor Interests; Nonassignability of Borrower's Interests.  Subject to the limitations set forth above on transfer of the Collateral, this Agreement will be binding and inure to the benefit of the Lender, its successors and assigns.  Borrower acknowledges and agrees its rights under this Agreement as well as any other Secured Loan Document may not be assigned in whole or part.

6.5     Waiver.  The Lender and the Borrower will not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the party against whom enforcement is sought.  No delay or omission on the part of the Lender or the Borrower in exercising any right will operate as a waiver of such right or any other right.  A waiver by the Lender or the Borrower of a provision of this Agreement will not prejudice or constitute a waiver of the Lender's or the Borrower's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by the Lender or the Borrower, nor any course of dealing between the Lender and the Borrower, will constitute a waiver of any of the Lender's or the Borrower's rights or of any of the Lender's or the Borrower's obligations as to any future transactions.  Whenever the consent of the Lender or the Borrower is required under this Agreement, the granting of such consent by the Lender or the Borrower in any instance will not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender or the Borrower.

6.6     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Lender has greater rights or remedies under the federal law of the United States of America, this paragraph will not

13

#5155383 v1 / 74115-001

be deemed to deprive the Lender of such rights and remedies as may be available under the federal law of the United States of America.

6.7 <u>Attorney's Fees and Costs</u>. The Borrower shall pay to the Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Lender in protecting, preserving or enforcing the Lender's rights and remedies under or in respect of any of the Obligations or any of the Collateral.

6.8 <u>Electronic Execution; Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts. This Agreement may be executed using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

6.9 <u>Waiver of Jury Trial</u>. THE BORROWER WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE SECURED LOAN DOCUMENTS, OR ANY RIGHTS, REMEDIES, OBLIGATIONS, OR DUTIES HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF. Except as prohibited by law, the Borrower waives any right which it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. The Borrower (i) certifies that neither the Lender nor any representative, agent or attorney of the Lender has represented, expressly or otherwise, that the Lender would not, in the event of litigation, seek to enforce the foregoing waivers or other waivers contained in this Agreement, and (ii) acknowledges that, in entering into the Secured Loan Agreement and the other Secured Loan Documents to which the Lender is a party, the Lender is relying upon, among other things, the waivers and certifications contained in this section.

6.10 <u>Venue and Consent to Jurisdiction</u>. The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document.

6.11. <u>Construction</u>. In the event of any conflict between the terms of this Agreement and the Secured Loan Agreement, the terms of the Loan Agreement shall control. The Parties each acknowledge and agree that he and it were represented by independent counsel in connection with the negotiation, execution and delivery of this Agreement, who reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

#5155383 v1 / 74115-001

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

EXECUTED as of the day and year first set forth above.

| BORROWER: | LENDER: |
|---|---|
| Car Toys Inc., a Washington corporation | |
| By: Daniel Brettler, Its: Chairman and Chief Executive Officer | Daniel Brettler |

#5155383 v1 / 74115-001

# SECURED LOAN AGREEMENT

## (Car Toys, Inc.)

This SECURED LOAN AGREEMENT (this "Agreement") dated as of this 3rd day of May, 2023, is between CAR TOYS, INC. ("CT" or the "Borrower") a Washington corporation, and Daniel E. Brettler ("Brettler" or the "Lender"). CT and Brettler are the "Parties" and each a "Party."

## I.     Recitals.

A.     CT is a corporation organized under the laws of the state of Washington, with its principal place of business at 4124 55th Avenue East, Seattle, WA 98105.

B.     Brettler resides at 4124 55th Avenue East, Seattle, WA 98105 and is the majority shareholder of CT.

C.     CT is the largest independent multi-channel specialty car audio and mobile electronics retailer in the United States.

D.     CT's sister company, Wireless Advocates, LLC, a Washington limited liability company, is the debtor in a pending case under Chapter 7 of the U.S. Bankruptcy Code, 11 U.S.C. §101, et seq.  Wireless Advocates's cessation of its operations and liquidation under Chapter 7 have poised severe financial challenges for CT and necessitated CT obtaining financing for its operations.

E.  Subject to the terms and conditions of this Agreement, the Brettler Secured Line of Credit Note, the Brettler Security Agreement and other related instruments and documents (collectively, the "Secured Loan Documents"), Lender may, in his sole discretion and without obligation of any kind whatsoever, elect from time to time to advance funds to Borrower  (the "Advances" and each a "Advance"), as may be necessary to fund CT's operations.  Lender's Advances shall be secured by security interests in substantially all the existing and future-acquired assets of CT (the "CT Collateral").

## II.     Agreement.

NOW THEREFORE, based upon the mutual agreements and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender, intending to be legally bound, hereby agree as follows:

1.     Brettler Secured Line of Credit Loan.

1.1     Discretionary Advances on  Brettler Secured Line of Credit Loan.  Subject to the terms and conditions of this Agreement, and in his sole discretion and without obligation of any kind whatsoever, Lender may make one or more discretionary Advances from time to time and up

#5216966 v1 / 32789.001

to the total amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00). This credit line shall be evidenced by the Borrower's promissory note (the "Secured Line of Credit Note"), payable on demand, and in the original face amount of the initial Advance or Six Hundred Thousand Dollars and 00/100 Dollars ($600,000.00). The Secured Line of Credit Note may be increased, amended and restated from time to time, should Lender, in his sole discretion, elect to make not only an initial Advance but one or more additional Advances.

1.2    Interest Rate on Secured Line of Credit Loan. Interest shall accrue at 8.0 percent per annum (the "Contract Rate Interest") on the principal amounts of all Advances under the Secured Line of Credit Note and on the principal amount(s) of any other "Obligations" owed Lender, as that term is defined in the Secured Loan Documents. Upon an Event of Default, additional Default Rate Interest at 5 percent per annum shall also automatically accrue on all such principal amounts.

1.3    Demand Obligations. Subject to the terms and conditions of the Secured Loan Documents, Borrower shall pay to Lender upon his demand all principal, interest and other amounts owing Lender on the Obligations owed to Lender.

1.4    Collateral. The Line of Credit Loan shall be secured by the CT Collateral.

1.5    Prepayment. Borrower may prepay the Secured Line of Credit Loan in full or in part at any time without penalty. Any prepayment will be applied first against expenses and indemnities due hereunder; secondly, against interest due on principal amounts; and thereafter against principal.

1.6    Loan Payments. All payments by the Borrower on the Secured Line of Credit Loan shall be made in U.S. Dollars and in immediately available funds.

1.7    Use of Funds. Advances under the Secured Line of Credit Loan shall only be used to defray the following costs:

(a)    employee payroll obligations, including without limitation, wages, salaries, benefits and payroll taxes;

(b) other expenses approved by Lender necessary to CT operations, including the payment of professionals as approved or authorized by Brettler;

(c)    the defense and prosecution of litigation by or against Borrower (the "Pending Litigation").

1.8    Conditions to Advances. This Section 1.8 shall govern Advances under the Secured Line of Credit Loan. Each Advance shall be conclusively deemed to have been authorized and made at the request of and for the benefit of the Borrower when it is credited to any deposit account of Borrower or when such Advance is funded in accordance with the instructions of the Authorized Officer of CT (as defined by resolution of the Board of CT).

a.    General Conditions to Advances. Each discretionary Advance requested by Borrower shall be in writing and shall state the amount and purpose of the requested

2

Advance, certifying that each of the following conditions to the requested Advance have been satisfied:

       i.      All conditions to closing set forth in Section 6 have been met;

       ii.      The Lender and the Authorized Officer of CT have approved and authorized the requested Advance;

       iii.      No Event of Default exists under this Agreement or the Secured Loan Documents and no event or circumstance then exists which with notice, the passage of time, or both would constitute a default under any of the Secured Loan Documents;

       iv.      Lender is not prevented from making advances under any applicable law, court order, agreement or otherwise;

       v.      No legal or administrative proceeding exists challenging the validity of or seeking to enjoin, set aside, review or otherwise challenge, Lender's security interests securing the Secured Line of Credit Loan; and

       vi.      No lawsuit or lawsuits have been filed following the date of this Agreement on behalf of one or more parties against Borrower claiming in an aggregate amount One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

Unless otherwise agreed by Lender, Advances shall only occur if all the foregoing conditions are met to Lender's satisfaction (or Lender has waived such requirement in writing), and Lender, in his sole discretion and without obligation, shall have elected to make any such Advances requested by Borrower. Lender, in his sole discretion and without obligation of any kind whatsoever, may elect to make an Advance notwithstanding that any one or more of the foregoing conditions is not satisfied, and by doing so Lender shall not be deemed to have waived his right to require the satisfaction of any such conditions with respect to any other Advance.

2.    <u>Legal Expenses</u>. The Borrower agrees to promptly reimburse Lender's legal fees and costs incurred in the drafting of this Agreement. Should Borrower be unable to fund this payment, these fees and costs shall be added to the principal amount of the Secured Line of Credit Loan.

3.    <u>Representations and Warranties</u>. When Borrower signs this Agreement, and until Lender is repaid in full, the Borrower makes the following representations and warranties to the Lender.

    3.1    <u>Recitals</u>.    The above Recitals serve as the basis for this Agreement and are a substantive, contractual part hereof. The Parties each acknowledge and agree that the descriptions, information and factual statements contained in the Recitals are true and correct as of the date hereof and are incorporated within this Agreement and made a part hereof for all purposes as if fully rewritten herein.

#5216966 v1 / 32789.001

3.2　Existence.　The Borrower is a corporation formed, in good standing and existing under the laws of the State of Washington.

3.3　Authorization. This Agreement, the Secured Loan Documents and any other instruments, agreements, financing statements or other documents which may be required hereunder are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational documents.

3.4　Enforceable Agreement.　Each Loan Document is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower and the CT Collateral  in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

3.5　Good Standing.　In each jurisdiction in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

3.6　No Conflicts.　No Loan Document conflicts with any law, agreement, or obligation by which the Borrower is bound.

3.7　No Event of Default.　There is no event which is, or with notice or lapse of time or both would be, an Event of Default under this Agreement.

3.8　Location of Borrower.　The chief executive office of the Borrower is located at the address stated in Recital A above.

4.　Covenants.　Except as otherwise agreed to in writing by Lender, the Borrower agrees, so long as any amount is owed by Borrower to Lender under this Agreement, to perform each of the following covenants:

4.1　Use of Proceeds.　To use the proceeds of the Line of Credit Loan only in accordance with the provisions of this Agreement or as otherwise agreed in writing by Lender. .

4.2　Other Liens.　Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except the following (collectively, the "Permitted Liens"):

(a)　liens for taxes not yet due;

(b)　liens outstanding on the date of this Agreement;

(c)　purchase money security interests in assets acquired after the Effective Date of this Agreement in the ordinary course of business or in favor of such other lenders as Lender may consent to for which adequate consideration is received and which do not, in Lender's reasonable discretion, impair or threaten to impair Lender's rights and remedies hereunder or under the Loan Documents; and

(d)　statutory liens of carriers, warehousemen, mechanics, materialmen, bankers and other liens imposed by law and created in the ordinary course of business that are not overdue

4

by more than 60 days or that are being contested in good faith and as to which adequate reserves have been established in accordance with generally accepted accounting principles.

       4.3    <u>Maintenance of Business and Assets</u>

       (a)    not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so;

       (b)    not to transfer any of the CT Collateral to a trust;

       (c)    not to enter into any sale and leaseback agreement covering any of the CT Collateral;

       (d)    to maintain and preserve all rights, privileges, and franchises the Borrower now has or hereafter acquires;

       (e)    not to declare or pay any distribution either in cash, equity or any other property on Borrower's stock now or hereafter outstanding, nor redeem, retire, repurchase or otherwise acquire any interest of any class of Borrower's stock now or hereafter outstanding;

       (f)    not to pay any compensation, bonus or other financial remuneration to any officer, director, employee or other person other than in the ordinary course of business:

       (g)    not to merge into or consolidate with any other entity; and

       (h)    not to (i) sell (other than ordinary course sales to customers), assign or otherwise transfer or encumber any intellectual property, (ii) assign or otherwise transfer or encumber this Agreement, or (iii) create an obligation whereby the Borrower is required to pay all or a portion of its earnings to any party in priority to the Lender, without first obtaining the prior written consent of Lender to such sale, assignment, transfer or encumbrance.

       4.4    <u>Loans</u>.  Not to make or receive any loans, advances or other extensions of credit, other than the Secured Line of Credit Loan, without first obtaining the prior written consent of Lender.

       4.5    <u>Notices to Lender</u>.  To promptly notify the Lender in writing of:

       (a)    any lawsuit filed or threatened to be filed against the Borrower;

       (b)    any material dispute between any governmental authority and the Borrower;

       (c)    any Event of Default under this Agreement, or any event which, with notice or lapse of time or both, would constitute an Event of Default;

       (d)    any material adverse change in the Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the Secured Line of Credit Loan, based on circumstances not described in the foregoing Recitals;

#5216966 v1 / 32789.001

(e)　　any change in the Borrower's name, legal structure, states of registration, places of business, or chief executive office, other than those contemplated in the foregoing Recitals; and

(f)　　any actual contingent liabilities of the Borrower, and any such contingent liabilities which are reasonably foreseeable.

4.6　　<u>Compliance with Laws</u>.  To comply with all applicable laws, regulations, and orders of any governmental authority.

4.7　　<u>Books and Records</u>.  To maintain adequate books and records in accordance with generally accepted accounting principles consistently applied, and permit any representative of Lender, at any reasonable time, to inspect, audit and examine such books and records, to make copies of the same, and to inspect the properties of Borrower.

4.8　　<u>Perfection of Liens</u>.  To help the Lender perfect and protect his security interests and liens, and reimburse him for related costs he incurs to protect his security interests and liens.

4.9　　<u>Cooperation</u>.  To take any action reasonably requested by the Lender to carry out the intent of this Agreement.

4.10　　<u>Performance</u>.  To punctually pay all principal, interest or other liabilities due under any of the Secured Loan Documents  at the times and place and in the manner specified therein.  To maintain and keep in force, for each business in which the Borrower is engaged, insurance of the types and in amounts customarily carried in similar lines of business.  To pay and discharge when due any and all indebtedness, obligations, assessments and taxes.  To promptly give notice to Lender of any Event of Default with reasonable detail.

5.　　<u>Default and Remedies</u>.  If any of the following events of default occurs (each an "<u>Event of Default</u>"), and if capable of cure is not cured within thirty (30) days, Lender may, subject to applicable law, declare the Borrower in default and declare all amounts owing by the Borrower under this Agreement to be due and payable in full, at which time all such amounts will become due and payable without presentment, demand, protest, notice of acceleration, intention to acceleration or any notice of any kind, all of which are waived by the Borrower.  If any Event of Default occurs, Lender will have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity.  If an Event of Default occurs under the paragraph entitled "Solvency," below, with respect to the Borrower, then, to the extent permitted under applicable law, the entire debt outstanding under this Agreement will automatically be due immediately.

5.1　　<u>Failure to Pay</u>. The Borrower fails to pay in full when due any amounts owing to Lender under the Secured Loan Documents, including without limitation payment in full of the Secured Line of Credit Loan on demand by Lender.

5.2　　<u>Other Nonpayment Defaults</u>.  Any default by Borrower not involving failure to pay occurs under this Agreement, any other Secured Loan Documents.

#5216966 v1 / 32789.001

5.3    _False Information_.  Borrower has given Lender false or misleading information or representations.

5.4    _Solvency_.  (a) Borrower files a bankruptcy petition, a bankruptcy petition is filed against Borrower, or Borrower makes a general assignment for the benefit of creditors.  The default will be deemed cured if any bankruptcy petition is dismissed with a period of 45 days after the filing; provided, however, that such cure opportunity will be terminated upon the entry of an order for relief in any bankruptcy case arising from such a petition; or (b) a receiver or similar official is appointed for a substantial portion of Borrower's business, or such business is terminated, or, if the Borrower is otherwise liquidated or dissolved.

5.5    _Lien Priority_.  The Lender fails to have an enforceable lien against the CT Collateral senior in priority to all other liens, security interests, or encumbrances, other than Permitted Liens.

5.6    _Lawsuits_.  Except for the Pending Litigation, any lawsuit or lawsuits are filed against Borrower seeking in an aggregate amount of One Hundred Thousand Dollars ($100,000.00) or more in excess of any insurance coverage, and/or which interferes with or threatens to interfere with Borrower's material obligations hereunder.

5.7    _Judgments_.  Any final judgments or arbitration awards are entered against Borrower, or Borrower enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of Twenty Five Thousand Dollars ($25,000.00) or more in excess of any insurance coverage.

5.8    _Material Adverse Change_.  A material adverse change occurs, or is reasonably likely to occur, in Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit, other than any of the material adverse changes described in the Recitals.

6.    _Conditions Precedent_.  This Agreement shall not become effective, binding or enforceable unless each of the following conditions precedent is satisfied, waived or extended by the Parties.

6.1    _Execution and Delivery of Agreement_.  Each Party shall deliver to each other Party counterparts of this Agreement, duly executed by an authorized representative.

6.2    _Execution of Other Loan Documents_.  Each party to the Secured Loan Documents shall deliver to each other Party counterparts of the Secured Loan Documents, duly executed by an authorized representative.

6.3    [Reserved]

6.4    _Proof of Authorization_.  Upon request of a Party, any and all Parties who are entities shall provide copies of such fully and properly executed company resolutions, authorizations, minutes, incumbency certificates or other documents as may be reasonably required to confirm the due authorization and capacity of the Party's undersigned representative to execute and deliver this Agreement.

7.    [Reserved]

#5216966 v1 / 32789.001

8.    Miscellaneous Provisions.

8.1    Governing Law; Consent to Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Washington.  To the extent that the Lender has greater rights or remedies under federal law, this paragraph will not be deemed to deprive the Lender of such rights and remedies.  The Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court, or any United States federal court, sitting in King County, Washington over any suit, action or proceeding arising out of or relating to this Agreement or any other Secured Loan Document.

8.2    Successors and Assigns; Beneficiaries.  This Agreement is binding on the Borrower's and the Lender's successors and assignees.  The Borrower agrees that it may not assign this Agreement.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective successors and assigns, and no other person or entity shall be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other Secured Loan Document to which it is not a party.

8.3    Severability; Waivers.  If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced.  The Lender retains all rights, even if he makes a loan after the occurrence of an Event of Default.  If Lender waives an Event of Default, he may enforce a later Event of Default.  Any consent or waiver under this Agreement must be in writing.

8.4    Attorneys' Fees.  The Borrower shall pay to the Lender on demand any and all expenses, including reasonable attorneys' fees and costs, incurred or paid by the Lender in protecting, preserving or enforcing the Lender's rights and remedies under this Agreement or any other Loan Document.

8.5    Notices.  All notices required under this Agreement will be personally delivered or sent by email, first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or to such other addresses as a party may specify from time to time in writing to the other party.  Notices and other communications will be immediately effective upon personal or email delivery or (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise, when delivered.

8.6    Electronic Signatures; Counterparts.  This Agreement may be executed and delivered (including by facsimile or email transmission) in any number of counterparts all of which, taken together, shall constitute the entire agreement between the Parties, all of which shall constitute one Agreement. The execution of one counterpart by any Party shall have the same force and effect as if that Party had signed all other counterparts.  This Agreement may be executed using electronic signatures (PDF) and will be effective and binding as fully as a manually executed instrument. The Parties agree to deliver all original manually signed pages promptly following execution thereof, but any failure to deliver such pages shall not affect the validity or enforceability of this Agreement.

8

8.7 <u>Construction</u>. The Parties each acknowledge and agree that it has been represented by counsel in connection with the execution and delivery of this Agreement, that it and its counsel reviewed and participated in the preparation and negotiation of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Borrower and Lender have executed this Agreement as of the date first above written:

| BORROWER: | LENDER: |
|---|---|
| CAR TOYS, INC., a Washington corporation<br><br>By:_____<br>　　　Daniel E. Brettler<br>Its: CEO<br>4124 55th Avenue East<br>Seattle, WA 98105<br>Email: dbrettler@cartoys.com | By:_____<br>　　　Daniel E. Brettler<br>4124 55th Avenue East<br>Seattle, WA 98105<br>Email: dbrettler@cartoys.com |

9

#5216966 v1 / 32789.001

# FIFTH AMENDED AND RESTATED
## SECURED PROMISSORY NOTE

$13,250,000.00 U.S.                                    Seattle, Washington
                                                       November 12, 2024

**FOR VALUE RECEIVED, CAR TOYS, INC.,** ("*Maker*"), promises to pay to the order of **DANIEL E. BRETTLER** ("*Holder*"), the principal sum of Twelve Million Five Hundred Thousand and 00/100 Dollars ($12,500,000.00), and such additional amounts up to a cap of Thirteen Million Two Hundred Fifty Thousand and 00/100 Dollars ($13,250,000.00) as Holder may in his discretion and without obligation advance from time to time to Maker, in U.S. funds, on the following terms and conditions. Capitalized terms herein shall have the same meaning as is provided in that certain Secured Loan Agreement and Brettler Security Agreement, each dated as of May 3, 2023 and which together with this Fifth Amended and Restated Secured Promissory Note (the "*Note*") constitute the "*Secured Loan Documents*" governing the loans evidenced by this Note. This Note amends, restates and replaces the previous promissory notes made by Borrower in favor of Lender as of the following dates and in the following principal amounts:

- December 13, 2023    $2,250,000.00
- January 18,2023       $600,000.00
- January 29, 2024      $500,000.00
- February 12, 2024     $750,000.00
- March 12, 2024        $500,000.00
- April 9, 2024         $400,000.00
- June 10, 2024         $7,500,000.00
- August 12, 2024       $9,250,000.00
- September 9, 2024     $11,250,000.00
- October 1, 2024       $12,500,000.00

1.      **PAYMENT; MATURITY**. The unpaid principal balance of this Note, and all other sums owing under the Secured Loan Documents or any other related instruments, agreements, or documents governing the Brettler loans as evidenced by this Note by Maker to Holder, shall be due and payable on demand. Maker shall have the right to prepay the principal balance due under this Note in whole or in part at any time without penalty. Payments made under this Note may be applied by Holder at Holder's option in any order to costs, interest, and/or principal.

2.      **INTEREST**.

        a.      **Interest Rate.** Except as otherwise provided herein, beginning on October 1, 2024, the outstanding principal amount evidenced by this Note shall bear interest at the rate that is equal to (i) the 30-day compounded Secured Overnight Financing Rate (SOFR) Average published by the Federal Reserve Bank of New York as the "30-Day Average" for the last business day of the month for which a payment of interest is to be made (as published at

https://www.newyorkfed.org/markets/reference-rates/sofr-averages-and-index) plus (ii) 0.75%. Interest accrued on this Note prior to October 1, 2024, shall be calculated at the rate of eight percent (8%) per annum, absent a default.

      b.    **Computation of Interest.**  All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed. Interest shall accrue on the day on which a disbursement under this Note and the Secured Loan Documents is advanced to Maker and shall not accrue for the day on which it is paid.

      c.    **Payment Date**.  One-half of the accrued interest on this Note as of December 31, 2024, shall be due and payable to Maker on December 31, 2024.  The remainder of the accrued interest on this Note shall be due and payable to Maker on June 30, 2025.  After June 30, 2025, interest shall continue to accrue on the unpaid balance of the Note as provided herein and shall be payable on demand.

    3.    **ACCELERATION AND DEFAULT INTEREST**.  Upon an Event of Default, as defined in Section 5 of the Secured Loan Agreement between Maker and Holder, which provisions are incorporated herein, the entire outstanding balance of principal owing under this Note and the Secured Loan Documents, shall, at Holder's option, be immediately due and payable.  Upon an Event of Default, additional Default Rate Interest at 5.0 percent per annum shall also automatically accrue on all such principal amounts.

    4.    **COLLATERAL**. Pursuant to the Brettler Security Agreement, all principal amounts advanced by Holder, all accrued interest, and all costs, fees, and other expenses Maker must pay under this Note and under any other Secured Loan Document (collectively, the "***Obligations***") are secured by all of the "CT Collateral" as defined in the Brettler Security Agreement.

    5.    **GENERAL PROVISIONS**.  All persons signing this Note do so as a principal and not as a surety, guarantor, or accommodation maker.  Holder may delay or forego enforcing any of Holder's rights or remedies under this Note without losing them.  Maker and any other person who signs, guarantees, or endorses this Note waives presentment, demand for payment, protest, and notice of dishonor.  Upon any change in the terms of this Note or forbearance with respect to Holder's rights under this Note, and unless otherwise expressly agreed by Holder at the time in writing, no person who signs, guarantees, or endorses this Note shall be released from liability.  Holder may renew, extend (repeatedly and for any length of time), or modify the terms of this Note or release any party or guarantor, or may impair, fail to realize upon, or perfect Holder's security interest in any property given as collateral for this Note, and may take any other action deemed necessary by Holder without the consent of or notice to anyone.  No waiver or modification of this Note shall be effective unless it is express, in writing and signed by the party against whom enforcement of the waiver or modification is sought.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.

#5717299 v2 / 32604-001

6. **CONSTRUCTION**. This Note and all rights and obligations of the parties pertaining to this Agreement shall be governed by and construed in accordance with the laws of the state of Washington, not giving effect to choice-of-law principles. The section headings set forth in this Note are for convenience of reference only and do not define, limit, construe the contents of, or affect the meaning or interpretation of this Note or such sections.

7. **WAIVER.** All persons signing this Note hereby waive presentment, demand, protest, and notice of dishonor and protest; and agree that extension or extensions of the time of payment of this Note or any installment or part thereof may be made before, at, or after maturity only by the written agreement of the Holder.

8. **ATTORNEYS' FEES.** Maker shall pay to the Holder, upon demand, all costs and expenses, including, without limitation, reasonable attorneys' fees and legal expenses, that may be incurred by the Holder in connection with the enforcement of this Note.

9. **SATURDAYS, SUNDAYS, HOLIDAYS**. If any date specified in this Note as a date for the making of any payment of principal or interest on this Note or the taking of any other action, should fall on a Saturday, Sunday, or a day which in Seattle, Washington, is generally observed by banking institutions as a legal holiday, the date for the making of that payment or taking of such other action shall be extended to the next subsequent date which is not a Saturday, Sunday, or legal holiday.

10. **JURISDICTION**. Maker and Holder hereby submit to the jurisdiction of any state or federal court sitting in King County, Washington, in any action or proceeding arising out of or relating to this Note and agree that all claims in respect of the action or proceeding may be heard and determined in any such court. Each of Maker and Holder waives any defense of inconvenient forum to the maintenance of any action or proceedings so brought.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

MAKER:  **CAR TOYS, INC.**, a Washington corporation

_____

By: Daniel E. Brettler, Treasurer and Chairman of the Board

#5717299 v2 / 32604-001